FANNY GRAECEN v. WALTER GRAECEN.

It is not necessary that actual violence be shown, to entitle the party to a divorce on the ground of extreme cruelty.

Isolated cases of wrong or cruelty of long standing, on the part of the husband, will not entitle the wife to a divorce, especially where a different course of treatment has since been pursued. But evidence of such acts are competent and proper, in connexion with more recent acts, to show a series of wrongs and injuries on the part of the husband.

A notice served by the husband on the wife, after the institution of proceedings against him for a divorce, requesting her to return, can avail nothing in his defence.

THE proceeding in this cause was instituted by the complainant by petition, under the act of 13th December, 1824, (*Elmer's Digest*, 141,) for a divorce from her husband, Walter Graecen, on the ground of extreme cruelty, and also for alimony. The defendant answered the petition. Evidence was taken by both parties, and the cause was heard upon the pleadings and proofs.

*A. Whitehead*, for complainant.

*Hartwell* and *O. S. Halsted*, for defendant.

THE CHANCELLOR. This is a proceeding under the act of 1824, by petition, for a divorce from bed and board on the ground

[Graecen v. Graecen.]

of extreme cruelty. The parties are now aged people; the complainant beyond sixty, and the defendant beyond seventy years of age. It is nearly forty years since the marriage took place, and the evidence exhibits a melancholy picture of unhappiness in domestic life. It is not a case produced by intemperance, or idleness, or extravagance, or dishonesty. The parties in their obligations to others seem, as far as can be judged from the case, to have acted like persons of excellent understanding, honest in their dealings, and very industrious and frugal; but towards each other there was evidently no bond of affection, and on the part of the husband a fierce, uncontrolable temper. I cannot fail to remark here, that the course taken in the examination of the witnesses, has been calculated rather to confuse and embarrass the case, than to aid the court in coming to a just conclusion upon its merits. The evidence should have been confined to the specific charges in the bill, whereas it has in reality been little short of a history of all the family quarrels for the last twenty years, a recital at all times disgusting and painful, and never to be resorted to but from the strongest necessity. My purpose will be to examine the charges in the bill by the evidence, and see whether the defendant has exposed himself to the accusation of extreme cruelty, upon which alone the complainant can entitle herself to the relief sought.

In point of time, the first and most serious charge to be considered is that in relation to Alexander Dawson. The complainant alleges that her husband, for the purpose of laying a foundation for a divorce from her, negociated a plan with one Alexander Dawson, by which he, Dawson, after his wife had gone to bed, was to go in her room and get into her bed, and then witnesses were to be introduced into the room suddenly and detect him in that position. If this charge be true, a more base attempt to ruin the character of his wife could not be conceived of, and should for ever absolve her from all further obligations to him. I have been slow to believe this story, so repugnant to all correct and manly deportment, but I confess my conviction, from the evidence, that it has too much foundation in truth. Alexander

[Graecen v. Graecen.]

Dawson swears to it himself, positively, and names two persons whom the defendant told him he had employed as witnesses to stay in the barn. The witness says he promised the defendant three or four different times that he would go to his house for that purpose, but never did go, and finally refused. He also says he was to receive for this act a pair of oxen worth from eighty to one hundred dollars. The character of this witness for veracity is impeached by several others, and by others again he is spoken favorably of. I would not give much credence to this story if it depended on the testimony of this witness alone, for I could desire no stronger impeachment of his character than the fact that he would suffer himself to be employed in so despicable and dishonorable a transaction. But we have it in evidence from Sophia, one of the daughters of these parties, that her father told her, when speaking of the stories that had been in circulation about him, that they were not true except the Dawson story, and then said that he blamed himself for that. The story, he said, was only true in part, for the proposition was made by Dawson to him, and not by him to Dawson, and he regretted he had listened to him. I see very little difference whether the defendant made the proposition to Dawson, or suffered Dawson to make such an one to him, and listened to it. He further added, that he finally told Dawson he would not accede to his proposition. To another daughter, Jane, he repeated substantially the same thing, and on another occasion. From the evidence of Julius A. Graecen, a son and a witness in behalf of the defendant, (although drawn from him with manifest reluctance,) it is evident the defendant gave him five dollars to be used to prevent Dawson from being a witness in this cause; and Dawson himself says, that he was persuaded not to attend as a witness, and that one Daniel McVickar took him to a stone and lifting it up, said, " There is some money for you, but I don't give it to you. This is to keep you from going to Morristown." The two persons whom the defendant named to Dawson as the persons he had employed to stay in the barn to keep watch for him, both declare they were never so employed, and yet a witness by the name of

Stephen Sanders swears, that he and another person were employed, at about the time Dawson speaks of, by the defendant, to stay in his barn, under pretence that there was something going on wrong in the house—taking away his things by his wife's father was mentioned—and that he did stay there until past midnight. From all this, if any credit is to be given to witnesses, there is too much foundation for the belief that the story Dawson tells is true in all its material parts.

Another ground of complaint made in the bill, is actual violence and threats of violence towards the complainant. I am happy in finding the evidence of positive violence insufficient, but that threats have on several occasions been made, and that too under circumstances calculated to alarm the complainant, (especially when made by a man of violent passions,) there can be no doubt. Margaret Alward testifies, that on one occasion, when they were at dinner, the defendant came in and said to his wife in a passion, bringing his hand down on the table, "I swear by God I will put that knife through your head, if they hang me for it." She further says, she has heard him more than once threaten to put her or kick her out of doors. The daughter Sophia confirms the account at the dinner table so far as to recollect his bringing his hand down on the table, and his being in a great passion, and hearing the words "if they hang me for it," but being disturbed by the scene she left the table. Sophia also says, that on another occasion, he took the axe from the woodpile in great anger, and went up to her mother's room with it in his hand, and the witness took hold of him and endeavored to restrain him. She saw him take her mother's cloak and stamp on it, and burn one of her dresses. At another time, the daughter Jane testifies, that she saw her father in a great rage take the axe and chase her mother round the house to a cellar door, and there raise the axe and threaten to split her down. The daughters spoke to him on the subject of his treatment to their mother, and complained to him that she had no peace; his answer was, that she did not deserve peace, and never should have peace. They represent him as ferocious and ungovernable at times, and

[Graecen v. Graecen.]

are evidently impressed that their mother was badly treated by their father. They say that during the last year their mother lived at home, they did not feel it safe to leave her there alone with him, as his conduct manifested so much hatred and dislike to her.

Another charge, which seems fully sustained against the defendant, is the manner in which he spoke of the complainant to his hands and to her, by calling her his devil, faggot of hell, a Baskenridge hypocrite, &c. Several witnesses confirm this statement. It seems the complainant was in the habit of attending church at Baskenridge, and was a member of the church there. He evidently intended to reproach her for her religious sentiments, and would at times refuse her a horse to go to church. When the neighbors took her with them, some of the witnesses say he reproached them for it. In sickness, also, he seems to have neglected his wife shamefully, never going in to see her, and sometimes refusing and objecting to having a physician sent for.

There are other instances stated in the bill, and in the evidence, of unjustifiable conduct on the part of the defendant, which it is unnecessary to examine, as I deem what has already been said a sufficient outline of this disgusting history to exhibit the case made by the complainant; a case which upon its face claims for her the protection of the court, unless the defendant can in some way defend himself against so serious accusations. Without going minutely into his evidence, it will be proper to consider some of the grounds of defence assumed by him.

And first, he alleges that the conduct of the complainant herself was calculated to excite his passions, and that she and the daughters have conspired against him. I am very far from considering the complainant blameless. She appears to be a woman of spirit and temper, but I can trace in her conduct nothing to justify the treatment she received. It is hardly to be supposed that a woman can receive every indignity at the hands of her husband, and never show resentment. It is human nature, and even if at times her conduct might afford some extenuation of

her husband's conduct, it can never justify it. The defendant is a farmer of respectable property, and the complainant, as is clearly proved, was a hard-working woman, and contributed her share in accumulating the property and bringing up the family. It was her habit to sell things from the farm, such as butter, and even grain at times, and supply the family with groceries and other necessaries not furnished from the farm. I have formed the opinion from the evidence, that the female branch of this family, both the mother and daughters, had a higher ambition than the defendant, and desired to place themselves in the world on the best footing in their power. For this I would rather commend them, and especially as it was done by their individual exertions, rather than by any undue calls upon the defendant. All that part of the evidence, therefore, relating to things taken from the place and exchanged at the store by the complainant, would seem to fall naturally and properly under this arrangement of the family.

It is attempted to fasten a charge upon the complainant of having posted up a notice of an infamous character at a Mrs. Heath's, impeaching her virtue; and from the evidence of Julius A. Graecen I was impressed that it must be so. He says he saw the writing in his mother's possession, which she read to him, and said it would be a fine thing to destroy her character. He says further, that she dressed up a girl by the name of Ruth Cummings in his clothes, and gives it as his impression that she sent the girl to paste it up at Mrs. Heath's gate. This seems very plain evidence, and yet the story on the face of it is unnatural for a sensible woman, as the complainant is reputed to be, for her detection would be certain. Jane, the sister of this witness, however, on her examination, says, that two persons, esquire Dayton and esquire Rickey, were called in at one time to settle some difficulties between the complainant and the defendant, when the defendant charged his wife with putting up this notice, and Julius was asked if he had ever seen the notice before, and he said he had not and knew nothing about it. If true, the fact of the complainant's having placed up a paper of

[Graecen v. Graecen.]

this kind at the door of a neighbor of unimpeachable character, would certainly detract much from her own standing ; but while I have no doubt, from the evidence of Mr. Heath and others, that such notice was put up, I am by no means satisfied that it was put up by this complainant. There is no proof but that of Julius to fix it upon her, and it seems that on another occasion he denied all knowledge about it.

Several of the hands who worked on the place have been examined, and they state, according to their own impressions, which of these parties was most to blame. In general they do not complain that Mrs. Graecen did not make proper provision for them, but they speak unfavorably of her general disposition and temper. Her conduct when she left her husband's house, in taking away household furniture, was certainly in the highest degree improper, and the goods might at any time have been reclaimed by the defendant. It was not a sufficient excuse for so doing, that she had labored with her own hands to procure most that she took, and that her desolate situation required it. This may afford some apology, but it would have been far better had she gone away empty-handed, and resorted to the laws of the country for her rights.

The charge of combination on the part of the daughters against their father and in favor of their mother, is not sustained. I see no sayings or doings on their part toward their father, that can expose them to this censure. If they believed their mother badly treated, they had a right to espouse her cause and vindicate her from reproach. They should do so, undoubtedly, in a proper form and manner, and for aught that appears it was so done.

It is further objected, that many of the transactions referred to are too far back, and should not now be brought forward to prejudice this cause. There is some weight in this objection, and if it were an isolated occurrence long since passed by, on which alone the cause rested, 1 should think it ought to prevail, and especially so if a different course of treatment had of late years been pursued. But the evidence is, that the bitterness and

ill feeling of the defendant towards his wife has not only contin-
ued, but been on the increase up to the time of her leaving her
home.    It is the connexion which exists between the acts of op-
pression on the part of this husband in former days and now,
showing a series of injustice and wrong on his part, and of long
endurance and forbearance on the part of the wife, that gives
force and propriety to this evidence.

It is objected, that as no actual violence is shown to the person
of the complainant, the case is not within the meaning of the
statute which authorizes a divorce for extreme cruelty.    What
are the limits to which the court are confined under this act, it
may not be easy to define, and it is not necessary so to do in the
present case.    I deem the conduct of the defendant as clearly
and plainly within the act.    In 4 *John. Chan.* 189, chancellor
Kent says, " That mere petulance and rudeness, and sallies of
passion, might not be sufficient, but a series of acts of personal
violence, or danger of life, limb or health are."    If the conduct
of this defendant in the Dawson affair, in raising the axe and
threatening to cut down his wife, and a continual use of insulting
language toward her, are not within the meaning of the act,
it would be difficult to find a case that is.    It is a case every way
much stronger than that in *Saxton*, 474, in which a divorce was
ordered.

As to the notice which the defendant served on his wife after
this suit was instituted, requesting her to come back, it can avail
him nothing.    If she lived there in the unhappy state related by
the witnesses, she was not bound to return, and I feel well satis-
fied the notice was only served to produce an effect on this cause.
The defendant did not wish his wife to return; indeed, he told
his daughter-in-law that if she did come back, he would choose
what corner of the house to put her in.

My view of this whole case is, that I am called upon by every
principle of justice to separate these parties.    How is this family
now situated ?    The father remains the sole tenant of his home.
The children, four in number, three of them females unmarried,
and the wife, have left it, and as they say, on account of the conduct

[Graecen v. Graecen.]

of this defendant. The girls say his treatment of their mother rendered their life unhappy, and the son, who went there to live with his wife after his mother left, has also gone, and the very night before he left had, as he says, a scuffle with his father, in which his father threatened to stab him.

One of the counsel of the defendant, indeed, stated on the argument, that he did not so much object to the separation, but protested against any decree for alimony. This would be cruel, indeed, to turn off this old woman, after toiling for nearly forty years on the farm, without a cent. She is now old and unable to procure a support without the assistance of her daughters, who have their own living to make. She is entitled to reasonable alimony. I shall, therefore, decree a divorce *a mensa et thoro*, for life, between these parties, and refer the question of alimony to a master in the usual form.