## CLOSE vs. CLOSE.

1. Grossly improper language, foul terms, and vile epithets, do not, of
themselves, constitute the cruelty contemplated by the statute authorizing
a decree for divorce from bed and board.

2. To constitute such cruelty, there must have been such violence as
to justify a reasonable apprehension of danger of life, limb or health,
from further cohabitation.

The bill in this cause was filed for divorce *a mensa et thoro*,
on the ground of extreme cruelty, and for alimony, and the
custody of the infant children of the parties.

The case was heard on bill, answer, replication, and proofs
on both sides.

*Mr. C. Parker*, for complainant.

*Mr. C. H. Winfield*, for defendant.

THE CHANCELLOR.

The parties to this suit are persons of respectable position
in society. The defendant is a man of very consider-
able property. They were married in 1846. For some years
previous to the filing of the bill, they had resided in Bayonne,

Close *v.* Close.

in the county of Hudson, and the defendant still resides there. From the time of their marriage until they came to this state, they had lived in New York. The bill was filed October 19th, 1870. On the 11th of that month, the complainant left her husband's house, not to return again to live with him.

The act concerning divorces, provides that, for extreme cruelty in either of the parties, this court may decree a divorce from bed and board, or for a limited time, as shall seem just and reasonable.

Legal cruelty has been defined as being " such conduct in either of the parties, as renders further cohabitation danger-ous to the physical safety of the other, or creates in the other such reasonable apprehension of bodily harm, as materially to interfere with the discharge of marital duty." 1 *Bishop on Marr. and Div.*, § 715.

The evidence in this case discloses much bickering between the parties, and it appears very clearly that the defendant has been in the habit of employing in altercations with his wife, on occasions of anger, grossly improper language to her, and has applied to her foul terms and vile epithets. These of themselves, however, do not amount to the cruelty contem-plated by the statute.

But, it is alleged on the part of the complainant, that the defendant has not only abused his wife by language, but has inflicted violence by blows upon her.

I deem it unnecessary in presenting my views of the case, to speak of any transaction anterior to the 3d of September, 1870, for the reason that the complainant says in her testi-mony, that she was not afraid of her husband till then. Besides, her daughter, Gertrude, in testifying to the trans-action of the 25th of September, 1870, says, that she had known her father before that occasion, to use violence to her mother ; that she had seen him fling dishes across the table, but never saw him before strike her with his hand. This daughter was, when she gave her testimony, twenty-one years of age, and as far as appears in the case, had lived at home all her life, up to the time when she left her father's

house, after her mother's final departure.　Her opportunities for observation must therefore have been good, and her sympathies appear to have been entirely with her mother.

The complainant's account of the transaction of the 3d of September, above alluded to, is that on that day, which was Saturday, the defendant told her that she must leave his house that night; that she told him that she would not leave then; that he said that she must then go, on the next day; that she refused, and then he told her that she must go on Monday, or he would kick her out of the gate.

She further testifies that she left the house on Monday, the 5th of September, and remained away two weeks and three days; that when she returned, she went into the house, and asked the defendant how he and the family were; that the dinner bell rang soon after she got into the house, and after dinner, he went into the parlor, and beckoned her, as she went out of the door, to come in; that she went in, and he told her to take a seat on the ottoman beside him, and said : ". How did you dare to show your face here?" that she said that that was her home, and that she had no other, and he said : " I advise you to leave, I did'nt expect to see you again, you upset all my plans."

She says she told him she would not leave until he had made suitable provision for her; that he told her that she had deserted her home and disgraced her family, and that she had better leave; that she then said she had not deserted her family, and that he knew she went to make a visit; that she had told him, and told the servants, and his father that she was going to make a visit; and she further told him that she would leave whenever he would make a suitable provision for her; that he then told her to put it into the courts and let them decide, and she said that she wanted an amicable settlement, and didn't want it to go into court; that he said he had his declarations all written out, and was going to get a divorce, and that he could get it, too; that the next morning, after breakfast, she went into the parlor, where he was reading a paper; that she said she wanted to have a little

talk with him, and he said " very well ;" that she said that they could not live as then, and that he must either renew his marriage vows and begin again, or else make a suitable provision for her ; that he replied only insultingly ; that she went up stairs, and in two hours she came down where he was putting up a stove, in the dining room, with a man ; that she said to him, " I want to have a little talk with you, now, if you can, if not, I will wait until you can." He was busy. That he then replied, " I will come now," and went into the parlor with her, and that she then said, " What arrangement are you going to make." The conversation that then passed between them, resulted in her saying to him, in response to statements and charges made by him, which aroused her indignation : " You know that you lie ;" and on his replying, " I'll swear to it," she rejoined, " I wish I was a man and I would knock you down." After this conversation she went up stairs and dressed herself and came down again, to go to the city of New York. She asked her husband for some " change," which he refused.

In her cross-examination, she says, that when she went away on the 5th of September, she did not intend to remain, and that she told the defendant that she was going to make a visit, but did not say where. Her statement on this head, is in accordance with the statement of the defendant in his testimony, though he denies that he ordered her to leave the house, or used the language which she declares he used upon that occasion. He says, she threatened to leave his house, unless he would make a settlement on her, which he declined to do, and he told her she could go whenever she pleased ; that she said she wanted some trunks to pack her clothes in, and he told her she could take the girls' trunks, if she wanted to ; that on Sunday night, she and the girls—her daughters—packed up all her things—four trunks full ; that she sent them by express to New York, and about 11 or 12 o'clock, on Monday, she went to the tool house, where he was at work, in the barn yard, and said, " Pa, I have come to bid you good-bye, I am going on a visit, and will be gone for a few

days." It appears from this statement of the parties, that, when she left his house on this occasion, on which she says he ordered her away, threatening to kick her out of, or over the gate, she told him, his servants, and his father, that she was going away upon a visit.

In her statement, above quoted, of the interview between her husband and her, when he expressed surprise at her return to the house, she did not justify her departure by his orders, or his treatment of her, but on the other hand, excused her absence solely upon the ground that she had notified him, and he was aware that she was going away, merely to make a visit.

I am at loss to reconcile this action on the part of the complainant, with the case she seeks to make against the defendant. Surely, if his conduct towards her had been so reprehensible ; if indeed, he had expelled her from his house with violent and threatening language, some reference to it, as the cause or occasion of her departure, was to be expected when she was upbraided by him on her return, and not an apology, based on her own voluntary action in leaving the house to make a visit.

The next transaction of importance in this family history, is that of the 25th of September, in which she alleges that he kicked her out of the house. The principal ground of complaint in this incident is, that he, as she alleges, kicked her off the stoop. Her version of the occurrence is supported by the testimony of one of her daughters, and also, by that of Mr. and Mrs. Maxwell, who were at their own house, at a distance from the scene of the transaction, but is contradicted by the sons, who were present on the stoop, also, eye witnesses to the scene.

Whatever may be the fact, it is quite certain that there was an altercation between her and her husband before the act complained of, in which she used language to him which he construed into an order to him to leave the house; and that, after the affair was over, she returned into the house,

and continued there until the 11th day of October, when she finally left.  She, however, appears to have gone, in the meantime, to the city of New York to make the purchases of which the defendant complains.  That they were of a very large amount, and against her husband's will, is not denied. It appears, also, that while she was away, between the 5th of September and the 21st, she consulted with her friends in the city of New York, as to the propriety of her leaving her husband.  She says, also, that her lawyer in the city of New York was not willing to commence a suit for separate maintenance against her husband, until she had provided herself with what was necessary for herself and her family.

The purchases which she thus made amounted, according to the defendant's statement, to between $3000 and $4000. They included, according to his statement, forty-four pair of kid gloves.  She admits there were over twenty-one pair, but how many exactly, she does not state.  In her testimony, on cross-examination, as to those articles, she does not profess to be able to enumerate them all, but gives among them, five shawls—a long shawl, a lace shawl, and three woolen shawls, (the lace shawl being for herself); sixty-six yards of silk, for three dresses; a very large amount of other dry goods; and also jewelry to the amount of $360, consisting of a pair of bracelets at $80, ear-rings at $45, an emerald ring at $65, a watch at $85, and an opera chain at $85.  She admits that, as a general thing, her husband provided well for his family, and she admits that she purchased these goods without his knowledge.  That this large and unauthorized purchase created, as it naturally would, and reasonably might have been expected to do, difficulty between the complainant and defendant, is most manifest from the evidence in the case.  One of the daughters says the defendant asked the complainant, how she dare run up such a bill.

The complainant says that, on the 11th of October, on her return from New York, where she had been shopping, her husband used very abusive language to her, and struck her

four blows with his cane on her arm, and three on her back, and that she was compelled to escape from the house to that of a neighbor, Mrs. Maxwell, and ask aid of the police for her protection.

Although this transaction is very circumstantially and minutely stated, and although one of the daughters corroborates the complainant in her version of it, I am not satisfied that, on that occasion, the defendant struck any blow except such as was accidental. He was in the habit of walking with a cane, being somewhat advanced in years, and subject to severe rheumatism in his feet, to such an extent, as one of the daughters testified, that he was sometimes laid up for weeks at a time. She added that she had seen him crawl up stairs on his knees, without putting his feet to the floor.

On the occasion under consideration, there appears to have been an altercation between the complainant and defendant in regard to her conduct in making the purchases of dry goods and jewelry, before mentioned. He insisted that she should hear what he had to say on the subject, and she endeavored to escape from the room. He sought to prevent her by putting up his cane for the purpose, and it appears that she seized it, and they struggled with it, and that in the strife she was hit with it. That this was the true state of the case, is evident from her statement to the chief of police. When he asked her whether she was sure her husband had struck her, she replied that she was so excited she could not tell exactly, whether he struck her with the cane, or whether she ran against it. She said her husband put up the cane in front of her.

The admitted hostility of the daughters to their father, detracts very materially from the weight of their testimony in the cause. The conduct of the complainant, when, in company with the chief of police and the policeman, she returned to the house, is of much significance. The chief of police testifies, that when they went to the house, he saw the defendant sitting on the front piazza, and went and sat down

beside him; that the complainant went into the house; that he talked with the defendant about fifteen minutes, about the general affairs of the town, politics, &c.; that the complainant came out of the house, the servant girl with her, and the baby, and a carpet bag; that the complainant turned round to her husband and said: "Pa, I am going away for a week or two, on a visit; I may not be gone so long." The defendant said: "All right; you may stay as long as you want to." The witness adds, this conversation was pleasant—no anger on either side.

It will be remarked, that on each of the occasions before mentioned, on which she left home—the first, as she says, at the command of her husband, and the next and last, on account, as she alleges, of his violent treatment of her—she stated to him that she was going to leave temporarily, merely, and was only going on a visit. This fact does not depend upon the testimony of the husband, or of the chief of police, or any other witness in the cause than the complainant herself. She admits, that on this last occasion, she told her husband, on leaving, that she might stay away several weeks.

The effect of the testimony in this case, upon my mind, is such as to lead me to the conclusion, that the complainant has not been subjected, at the hands of her husband, to any treatment which can justly or properly be termed extreme cruelty, and that she never, at any time, had reason to consider herself in danger. That the defendant's language to his wife has been indefensible, I have no doubt. Whether the provocation he pleads is any apology for it or not, it is not necessary to consider. Since the complainant left his house, on the 11th of October, he has endeavored to persuade her to return, but her friends have been unwilling that she should do so.

The case does not present the features required by the statute, to warrant a decree of separation. It is true, it has been thought that this court has, in two reported cases, given to the act, a construction somewhat more liberal than that

which, by this adjudication, I put upon it. But I do not think so. In *Clutch* v. *Clutch*, *Saxt.* 474, a separation for three years · was decreed. The defendant in that case, was· proved to be an intemperate man. In one instance, he had turned his wife and children out of doors and compelled them to take refuge in her father's house. In another, he· was represented to have taken his wife up forcibly, and turned her out of doors, and shut the door upon her. She· had exhibited marks and bruises on her person, which she represented to be the effect of his violence, and he had frequently refused to provide for his family the common necessaries of life, and left them destitute ; and several witnesses concurred in the opinion that it would be unsafe for the wife to live with her husband.

In *Greacen* v. *Greacen*, 1 *Green's Ch.* 459, the court said ·: " It is objected, that as no actual violence is shown to the person of the complainant, the case is not within the meaning of the statute which authorizes a divorce for extreme cruelty. What are the limits to which the court is confined under this· act, it may not be easy to define, and it is not necessary to do so in the present case. I deem the conduct of the defendant as clearly and plainly within the act. In 4 *Johns. Ch.* 189, Chancellor Kent says, 'that mere petulance, and rudeness, and sallies of passion might not be sufficient, but a series of acts of personal violence, or danger of life, limb, or health, are.' If the conduct of this defendant in the Dawson affair, in raising the axe and threatening to cut down his wife, and a continual use of insulting language towards her, are not within the meaning of the act, it would be difficult to find a case that is." It was proved in that case that the defendant had, on one occasion, in a great rage, taken the axe and chased the complainant around the house to a cellar door, and then raised the axe and threatened to split her down. It was proved also that on one occasion, when the family were at dinner, he came in, and addressing his wife in a passion, bringing his hand down upon the table, swore a terrible oath, that he would put that knife through her head,.

though they should hang him for it ; and it appeared that the family did not feel it safe to leave the defendant alone with the complainant, so much hatred and dislike did he manifest towards her.

In the case before me, I am not satisfied that the defendant has been guilty of any violence towards his wife, which would justify a reasonable apprehension of danger of life, limb, or health, from her cohabitation with him.

The bill will be dismissed.