This is a suit for divorce from bed and board on the ground of extreme cruelty.
The parties were married in 1912, and resided together until the early part of 1918, when the wife withdrew from the defendant's home for a short time, returning to him, however, and remaining with him until December, 1922. She alleges that the hiatus in their cohabitation was due to attempts upon his part for sexual intercourse in perverted form. Although this is strenuously denied by him, I am inclined to believe that what she says is true, both because of corroborating circumstances proved in the cause and the man's undoubted salacious mind. His entire appearance and manner would tend to classify him as of a rather undeveloped mind, and of habits that would account for his possession of an *Page 238 
exceedingly revolting picture under the circumstances detailed by his wife rather than in the innocent manner alleged by him. In addition, there was the testimony of several witnesses, such as Mrs. Bey and Mrs. Spath, to indicate an unrestrained and unrestrainable sexual appetite.
The main ground is an unwarranted accusation of sexual infidelity against the petitioner. She swears that the defendant constantly accused her of adultery, in which she is corroborated by her daughter and the postmaster at Hackensack, in an incident where the husband discontinued the delivery of mail at his home, and called for it in person at the general post office, in the hope, unquestionably, of thus securing some incriminatory letters from her suspected paramours. It should be said that there was not a scintilla of evidence of adultery produced. The petitioner says that on one occasion, in the lobby of a theatre, her husband said to her: "Turn around; it looks as though you were lying on the flat of your back in the grass some place." He says that he said no such thing, but did say to her: "Look at your coat; it looks terrible: looks as though you were laying in the grass." I also believe the wife rather than the husband in this respect, and look upon his testimony as the customary effort of one who cannot deny a conversation, garbling it so as to give an entirely different impression from the true state of fact. In addition, he was guilty of the most atrocious remarks to his wife, sometimes alone and sometimes in the hearing of their own daughter, such as when reading a newspaper, and saying: "Look here; here's another woman who got children from another guy." "No man knows if the children are his." "How do I know what guy comes in here at night."
The only act of threatened violence to which the petitioner testifies took place in December, 1922, just prior to the final separation of the parties; but I must confess that I do not consider it of any importance in this case because it was an isolated instance, never repeated, and because from her future conduct I do not believe that the petitioner was really placed in fear for her personal safety. I believe that it was the occasion of her leaving her husband, but not the cause. *Page 239 
Thus, there is presented a case wherein there has been no violence exhibited against the wife and no reasonable fear thereof, but only a systematic and persistent course of the vilest accusations of adultery against a woman by her husband, who not only presents no evidence thereof, but, in his denial of her testimony, concedes her to be a virtuous woman, and, in fact, says that there never was any doubt of her virtue in his mind. I have been considerably puzzled as to the decision that ought to be reached in this case. In the language of the bar, it is a very close one. At the close of the hearing, it was my first impression that extreme cruelty had not been proved. It appeared to be a case similar to Linnekogel v. Linnekogel,122 Atl. Rep. 372. But in that proceeding there was no persistent charge of adultery, or any at all, in fact, and comment thereon was made, and such accusations were characterized, as "the most grevious insult that can be put upon a woman." But, taking into consideration all the circumstances, I have determined that this woman is entitled to the decree she seeks. For many years it was seriously mooted by members of the bar as to whether or not there should be a finding of extreme cruelty in the absence violence exhibited against the wife and no reasonable fear of some specific act of violence. As early in the annals of this court asGraecen v. Graecen, 2 N.J. Eq. 459, Chancellor Pennington was in some doubt and expressed difficulty in defining "extreme cruelty." In reply to the objection that there had been no actual violence, he said: "What are the limits to which the court are confined under this act, it may not be easy to define, and it is not necessary so to do in the present case." He then found, as might have been expected, that an attack upon the wife by the husband, armed with an axe, did not constitute actual violence.
In the case of Close v. Close, 24 N.J. Eq. 338, Chancellor Runyon said that what he called "indefensible" language on the part of the husband did not constitute extreme cruelty in the absence of physical violence. On appeal, the decree of the chancellor was reversed, but the opinion in 25 N.J. Eq. 526,
shows that the appellate *Page 240 
court found, as a fact, that physical violence had been proved. In the leading case of Smith v. Smith, 40 N.J. Eq. 566, where the opinion of this court and the court of errors and appeals will be found together, there was proof of physical violence on the part of the husband, and on the last page of the opinion of the appellate court it is made to appear that there was reasonable ground for the wife to fear bodily injury in addition to the horrible accusations of incest that had been made against her. And, so, with all the cases with which I am familiar, prior to the one presently to be mentioned, there was some violence proved, greater or less in different cases, wherever a decree has been entered on the ground of extreme cruelty. In fact, Mr. Biddle, in his work on Divorce Practice, written in 1912 at p.96 (2d ed.), says:
"The court has not found as a fact, in any reported case, that mere words, however coarse, abusive or threatening, have impaired the wife's health or endangered her future safety * * *. Yet the court does not exclude the possibility of a case where words only will suffice. Some regard must be paid to the refinement and circumstances in life of the parties, where actual violence is absent."
Quoting Close v. Close, supra. The first and, so far as I know, only reported case where a successful wife, in a suit on the ground of extreme cruelty, proved no violence upon the part of her husband, and the case to which I have just referred, isDoty v. Doty, 92 N.J. Eq. 660. In that case, the husband was frequently intoxicated and out of work, with the consequent deprivation of the necessaries of life to his family, called his wife vile names, and, as in the case at bar, charged her with adultery, introduced dissolute men and women into his house until late hours of the night, with indecent language, so that the petitioner was unable to secure her proper rest. In that case, the familiar language of Vice-Chancellor Van Fleet was quoted, as expressed by him in Black v. Black, 30 N.J. Eq. 215, to be found on page 221. The Black Case, it will be recalled, was a property suit, not involving the subject of divorce, so that the language of the vice-chancellor, adopted by the court of errors and appeals, is no exception to the presence of violence prior to the Doty *Page 241 Case. It is true that in Spence v. Spence, 74 N.J. Eq. 786,
Chancellor Walker (then a vice-chancellor) said it would appear, "there must be some form of violence coupled with a false charge of adultery," but that was before the court of errors and appeals had spoken in the Doty Case. But, however, the state of the law may have existed before Doty v. Doty, supra, I take it to be established now by the court of last resort that no physical assault is necessary where the conduct of the husband, if (in the language of Vice-Chancellor Van Fleet) he is allowed to retain his power over his wife, her life or health will be endangered,or he will render her life one of such extreme discomfort and wretchedness as to incapacitate her to discharge the duties of a wife. And why should this not be the rule? The attitude of the courts has been revolutionized in the last one hundred years with regard to the reciprocal rights and duties of baron and feme.
To a refined and virtuous woman, an accusation of adultery would be far more cruel than a blow. It is common knowledge that, in defense of her honor, she will sacrifice her life. Hence, to be charged with the crime that makes her a social outcast by the man who should of all the world believe in her, is the most torturing treatment to which she can be subjected. And when, as in the casesub judice, there is added to this enormity the further facts of spying upon her, charging her publicly with alleged iniquities of which she is innocent, and, especially, in the presence of the daughter that she has brought into the world, it seems to me clear that to compel her to reside with, and under the roof of, her husband, to eat of his bread and sleep in his bed, would destroy the health of any sensitive and well-bred woman. The petitioner gave proof on the witness-stand by her manner, even stronger than her testimony, of the ravages of her past life with her husband upon her health. She is of much more refinement and finer sensibilities than he.
Of course, no decree would be advised unless I was absolutely assured and completely convinced that the petitioner had suffered the insults alleged. But she has succeeded by such clear and convincing proofs in substantiating her charge *Page 242 
that there remains no doubt in my mind of her truthfulness. And, further, this systematic and continued torture was not an occasional word of innuendo thrown out in the heat of anger under strong provocation, but an advised and coldblooded effort to hurt and humiliate the wife.
I will advise a decree of divorce from bed and board for life.